# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00327-CR

**Renee Louise Halay, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT
### NO. CR2006-177, HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Renee Louise Halay guilty of thirteen counts of fraudulently filing a financing statement with intent to harm, *see* Tex. Penal Code Ann. § 37.101 (West 2003), and two counts of retaliation, *see id.* § 36.06 (West 2003). The district court sentenced Halay to two years' imprisonment, probated for five years, for the thirteen counts of fraudulently filing a financing statement, and to ten years' imprisonment, probated for ten years, for the two counts of retaliation. The district court also assessed a $2,000 fine, court costs, and restitution of $30,000 for one of the retaliation counts. On appeal, Halay argues that the evidence was legally and factually insufficient to support the verdicts, that error in the jury charge allowed the jury to reach non-unanimous verdicts, that her trial counsel was ineffective for failing to move for a directed verdict and for failing to strike an allegedly biased juror, and that prosecution for counts nine, ten, and eleven of fraudulently filing a financing statement violates the double jeopardy clause of both the federal and

state constitutions. *See* U.S. Const. amend. V; Tex. Const. art. I, § 14. We hold that the evidence was legally and factually sufficient to support the verdicts, that there was no error in the jury charge, and that Halay was not prejudiced by ineffective assistance of trial counsel. We also hold that the double jeopardy clause does not bar her prosecution for counts nine, ten, and eleven of fraudulently filing a financing statement; however, it does bar her prosecution for counts one and eight. Therefore, we set aside the judgment of conviction for two of the counts of fraudulently filing a financing statement. We affirm the other judgments of conviction.

## BACKGROUND

The Uniform Commercial Code establishes a process by which a creditor can file a financing statement with the Secretary of State's Office. *See* Tex. Bus. & Com. Code Ann. §§ 9.501-.527 (West 2002 & Supp. 2008). When a debtor uses property as collateral for a loan, the creditor notifies other potential creditors of its security interest in the debtor's collateral by filing a financing statement and a signed security agreement with the Secretary of State.[1] Then, when a debtor seeks another loan, the new potential creditor will search the Secretary of State's database for prior liens and take those into consideration when deciding whether to grant the loan.

At trial, Halay admitted to filing financing statements which claimed that she had a security interest in property owned by several state and county officials who were connected with

---

[1] For certain types of collateral, the financing statement would need to be filed with the county where the collateral is located, rather than with the Secretary of State. *See* Tex. Bus. & Com. Code Ann. § 9.501 (West 2002).

2

proceedings against Halay and her son, Jeffrey Beau Halay,[2] for various traffic violations, and against a deputy sheriff who attempted to serve her with process.[3] In each of these financing statements, Halay listed herself as the creditor, a public official as the debtor, and all of the named debtor's property as the secured collateral.

In June 2004, Department of Public Safety Trooper Joseph Evans stopped Halay and issued her a citation for failure to wear a seat belt. When Halay failed to appear at the pre-trial court date, the jury setting, or the jury trial, Justice of the Peace Darrell Hunter issued a failure to appear citation and an arrest warrant for the seat belt citation. Constable Bobby Jahns attempted to execute the citation and the warrant at Halay's home. Halay responded by sending Jahns an invoice for $20,000 for "land use fees" for entering her property, which she had marked with "no trespassing" signs. Halay later sent Jahns a "Notice of Default," which claimed that because Jahns had not disputed the charges, he had acknowledged and agreed to them. Halay then sent a "Second Notice of Default," followed by a "Final Notice of Default," before filing a financing statement with the Secretary of State claiming an interest in "all of [Jahns's] assets, land, and personal property . . . now owned and hereafter acquired" as security for a $20,000 debt on April 6, 2005.

In addition to filing against Jahns for attempting to serve the warrant, Halay filed against Trooper Evans, Judge Hunter, and the prosecuting attorney, Kimberly Austin. Halay initially

---

[2] Because Jeffrey Beau Halay shares the same surname as the appellant in this case, we will refer to him by his first name. We will continue to refer to the appellant as "Halay."

[3] The actions that were the impetus for Halay's filings took place in multiple counties. Halay filed each of the financing statements by either submitting them electronically from her home in Comal County, or by mailing them from a post office located in Comal County; therefore, each of the counts of filing a fraudulent financing statement and retaliation occurred in Comal County.

sent a document titled "Notice and Demand of a Commercial Lien/Criminal Complaint for Harms and Injuries Perpetrated Against Renee Louise: Halay" to Judge Hunter's court. In this document, which was addressed to Hunter, Evans, and Austin, Halay disputed that she owed any fines for the traffic ticket and for failing to appear, claiming that she could not be ticketed because she was not engaged in commercial activity at the time she was stopped. Halay alleged that the traffic stop and the subsequent court proceedings violated several state and federal laws and that Hunter, Evans, and Austin therefore owed her $735,000. Halay next sent a "Notice of Default," which claimed that because Hunter, Evans, and Austin had not disputed the charges, they acknowledged and agreed to them.[4] Halay then sent what she called a "Notice of Demand and Duly Executed Affidavit of Truth of Criminal Complaint/Commercial Lien," which stated that if Hunter, Evans, and Austin did not reply, she planned to sign their names to a security agreement and claim a $785,000 security interest in their property. When she did not get a response to this document, she sent a "Notice of Execution of Commercial Lien." Halay sent Hunter, Evans, and Austin another "Notice of Default," a "Second Notice of Default," and a "Final Notice of Default," before filing financing statements with the Texas Secretary of State against each of them on October 11, 2004, claiming a security interest in all of their "assets, land, and personal property . . . now owned and hereafter acquired."[5]

Halay and her son Jeffrey took similar actions against police officers, judges, and attorneys involved in prosecuting Jeffrey's traffic violations. In 2004, Jeffrey was arrested in Comal County after failing to appear before Municipal Judge Stacy Padgett in connection with a traffic

---

[4] The "Notice of Default" increased the claimed debt from $735,000 to $785,000.

[5] The financing statement did not list a debt amount.

ticket. Jeffrey then sent a "Notice and Demand and Duly Executed Affidavit of Truth of Criminal Complaint/Commercial Lien" to Judge Padgett's court, accusing Judge Padgett and several other city employees of violating his rights and claiming that they therefore owed him $1,165,000. A few weeks later, Jeffrey sent an alleged "Security Agreement" to the same city officials. In this document, Jeffrey claimed that his name was copyrighted, that he charged $500,000 per use of his name, and that any further use by the officials manifested their "intent of being contractually bound."

The City of Schertz forwarded these documents to its attorney, Michael Spain. Spain and his associate, Benjamin Cook, sought and were granted a temporary restraining order prohibiting Jeffrey and his "agent, servants, employees, attorneys, or those persons acting in concert or participation" with Jeffrey from "intentionally or knowingly filing any document that seeks or aims to encumber any personal or real property of [Judge Padgett or court employee Esther Mendoza], including any document filed with the Texas Secretary of State." After granting the TRO ex parte, the district court held a hearing and granted a temporary injunction. According to Cook, Halay was present at the hearing and heard the court's oral ruling and admonishment that any such filing would be fraudulent and unlawful. Less than a month later, on February 14, 2005, Halay filed a financing statement with the Texas Secretary of State claiming a $13,665,000 security interest in the "assets, land, and personal property . . . now owned and hereafter acquired" by Judge Padgett, Michael Spain, and Benjamin Cook. In April of 2005, Halay was held in contempt of court for violating the TRO.

Halay and her son followed a similar course of action against Garden Ridge, Texas, officials in relation to another traffic ticket Jeffrey received. When Jeffrey failed to appear in court, Municipal Judge Roy Richard issued an arrest warrant, which was executed by Chief of Police Walt

5

Myers. According to the Garden Ridge city attorney, George Hyde, Jeffrey then began to send correspondence to the City which asserted claims against "the City, the mayor, the city clerks, and a number of other people in addition to the court." Hyde sent a letter to Jeffrey informing him, "You are mistaken if you believe these self-imposed deadlines are somehow enforceable or if you believe the City somehow agrees to any of your demands by choosing not to respond. . . . Please know that the City does not agree to any relief you seek and denies any wrongdoing whatsoever." However, Jeffrey continued to assert claims against the City and its officials, and began to list Hyde in the documents as well. Jeffrey sent correspondence to Judge Richard, Chief Myers, and Hyde, claiming that Jeffrey's name was copyrighted and that each use of his name would cost them $500,000. Jeffrey demanded that the City turn over any documents that contained his name and alleged that not turning over these documents constituted acceptance of Jeffrey's offer to contract and granted Jeffrey a security interest in their property. Halay then sent a "Notice of Default" which stated, "This is lawful notice of your default by acquiescence to communications subject to Jeffrey-Beau Halay's © presentment." On April 4, 2005, Halay filed a financing statement with the Texas Secretary of State against Richard, which purported to claim an interest in all of his "assets, land, and personal property . . . now owned and hereafter acquired" as security for a $2,130,000 debt. The next day, Halay filed against Hyde for the same amount.

Halay continued this course of conduct in Comal County, filing financing statements with the Texas Secretary of State against officials involved in traffic violation cases against her son. Justice of the Peace Diana Guerrero issued a warrant for Jeffrey's arrest when he failed to appear at trial. In response, Jeffrey sent a "Notice by Written Communication/Security Agreement" to

6

Guerrero's court. This document claimed that Jeffrey's name was copyrighted and that any "unauthorized use" of his name would "consensually bind[]" Guerrero and Comal County Sheriff Bob Holder to Jeffrey and thus grant Jeffrey a $500,000 security interest in their property. Jeffrey then sent an invoice to Guerrero's court claiming that Guerrero and Comal County Sheriff Bob Holder owed him $16,500,000—$500,000 for each time Jeffrey's name was used on several arrest warrants and other court documents. Halay then sent a "Notice of Default" claiming that because they did not respond to Jeffrey's earlier notices, they had consented to the charges. On March 16, 2005, Halay filed a financing statement that purported to claim a security interest in "all of [Holder's and Guerrero's] assets, land, and personal property . . . now owned and hereafter acquired" as security for a $16,500,000 debt. On April 20, 2005, she filed a second financing statement against Guerrero for the same amount.

Comal County Deputy Sheriff William Faulkner became the target of Halay's filings when he went to her house in an attempt to serve her with notice of a property tax collection suit by Bexar County. Halay responded by sending Faulkner an invoice for $5,000 for "land use fees" for entering her property, which she had marked with "no trespassing" signs. Halay later sent a "Notice of Default" to Faulkner, which claimed that because Faulkner had not disputed the charges, he had acknowledged and agreed to them. Halay then sent a "Second Notice of Default," followed by a "Final Notice of Default," before filing a financing statement with the Texas Secretary of State on February 10, 2005, claiming an interest in "all of [Faulkner's] assets, land, and personal property . . . now owned and hereafter acquired" as security for a $5,000 debt.

7

At trial, Halay testified on her own behalf, stating that she filed the financing statements because she felt her family was being harassed by city and county law enforcement officials. She claimed that Jeffrey was receiving undeserved tickets and not receiving fair trials. Both Halay and her husband Michael testified that city and county officials harassed and physically abused Halay and Jeffrey. In addition, two neighbors testified that police cars had begun to monitor the neighborhood and the Halay home. Halay testified that this harassment led her to conduct internet research and seek advice from friends about how to handle the situation. According to her friend Dessie Andrews, Halay was "bewildered and frustrated" by her son's many citations for traffic violations. Andrews, a former paralegal, advised Halay to file a civil rights lawsuit against the offending police officers and judges, but warned Halay that such suits were difficult to win.

Instead of filing a lawsuit, Halay chose to follow what she called the "non-judicial" route of filing financing statements, which she referred to as "commercial liens." Halay said her research led her to believe that "all crime is commercial." Halay testified that she and Jeffrey "started treating these citations as offers to contract" that they could refuse to accept, and that because they had refused to contract, she believed there was no need to attend the court hearings on the citations. When Halay or Jeffrey were fined after failing to appear in court, she began to file "motions" complaining about what she perceived to be a lack of due process. When these "motions" were ignored or denied, she turned to the "commercial lien" process. Halay testified, "I was trying to get their attention. I wanted somebody to respond to me. I wanted them to stop. I wanted them to leave us alone. . . . I thought this was finally the teeth that would get them to stop." Halay further testified that she had no intention of collecting any of the "debts" or foreclosing on the attached property.

8

The jury found Halay guilty of thirteen counts of fraudulently filing a financing statement, *see* Tex. Penal Code Ann. § 37.101, and two counts of retaliation against government officials, *see id.* § 36.06.[6]

## DISCUSSION

In twelve points of error, Halay argues that the evidence was legally and factually insufficient to support the verdicts (points of error two through five), that error in the jury charge allowed the jury to reach non-unanimous verdicts (points of error six and seven), that her counsel was ineffective for failing to move for a directed verdict (point of error one) and for failing to strike an allegedly biased juror (points of error eight through eleven), and that prosecution on three of the counts of fraudulently filing a financing statement violated the double jeopardy clause of the federal and state constitutions (point of error twelve).

*Legal and Factual Sufficiency*

In points of error two through five, Halay argues that the evidence was legally and factually insufficient as to both the fraudulent filing offenses and the retaliation offenses.

---

[6] The thirteen counts of fraudulently filing a financing statement corresponded to the statements filed against: (1) William Faulkner on February 10, 2005; (2) Diana Guerrero on March 16, 2005; (3) Bob Holder on March 16, 2005; (4) Diana Guerrero on April 20, 2005; (5) Darrell Hunter on October 11, 2004; (6) Kimberly Austin on October 11, 2004; (7) Joseph Evans on October 11, 2004; (8) Robert Jahns on April 6, 2005; (9) Stacey Padgett on February 14, 2005; (10) Michael Spain on February 14, 2005; (11) Benjamin Cook on February 14, 2005; (12) Roy Richard on April 4, 2005; and (13) George Hyde on April 5, 2005.

The two counts of retaliation corresponded to the financing statements filed against Deputy Faulkner for attempting to serve citation on the tax suit and against Constable Jahns for attempting to execute the arrest warrant for Halay.

In reviewing the legal sufficiency of the evidence, we review all of the evidence in the light most favorable to the verdict. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton*, 235 S.W.3d at 778. We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Clayton*, 235 S.W.3d at 778.

In reviewing the factual sufficiency of the evidence, we consider all the evidence in a neutral light, while giving due deference to the jury's determination. *See Sims v. State*, 99 S.W.3d 600, 604 (Tex. Crim App. 2003); *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). Evidence is factually insufficient when it is so weak that the verdict seems clearly wrong and manifestly unjust, or when the verdict is against the great weight and preponderance of the evidence. *Berry v. State*, 233 S.W.3d 847, 854 (Tex. Crim. App. 2007); *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). The jury is the sole judge of the credibility of the witnesses and the weight to be accorded their testimony. *Vasquez*, 67 S.W.3d at 236. We may not reweigh the evidence and substitute our judgement for that of the jury. *Watson*, 204 S.W.3d at 417; *King v. State*, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000).

The elements of the offense of fraudulently filing a financing statement are that a person (1) knowingly presents for filing or causes to be presented for filing (2) a financing statement (3) that the person knows is forged, contains a materially false statement, or is groundless. Tex. Penal Code Ann. § 37.101(a). The filing of a financing statement that contains a materially false statement or that is groundless is upgraded from a Class A misdemeanor to a state jail felony

10

if the person commits the offense with the intent to defraud or harm another. *Id.* § 37.101(b). In her second and third points of error, Halay argues that the evidence was legally and factually insufficient to support the verdicts of guilty on any of the counts of fraudulently filing a financing statement because the evidence could not support a finding that Halay filed the statements with knowledge that they were materially false or that she did so with an intent to harm.[7]

To establish that Halay acted knowingly, the State had to prove that Halay was aware of the nature of her conduct and the circumstances surrounding her conduct. *See Id.* § 6.03 (West 2003). Such knowledge can be proven through circumstantial evidence and can be inferred from the "acts, words, and conduct of the accused." *See Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

Halay claims that she believed the financing statements she filed were a legitimate means of legal recourse for perceived wrongs against herself and her family by various local officials. Halay contends that because she was mistaken on the law—on her ability to refuse to contract with the government and on the legitimacy of using the financing statements to challenge traffic violations—she did not have the requisite knowledge that the statements contained a materially false statement.

The jury could have reasonably rejected Halay's assertion that she believed the financing statements were a legitimate recourse. Halay's testimony revealed that she read the letter

---

[7] Because the jury charge required the jury to find that Halay falsely named the government officials as debtors and herself as a secured party (see our discussion of the jury charge, *infra*) we analyze the sufficiency of the evidence to prove that Halay filed a financing statement that contained a material false statement. We need not address whether the State presented sufficient evidence to prove either of the alternate grounds for conviction—that the statements were forged or groundless.

the Garden Ridge city attorney sent Jeffrey, which stated that the default notices and the deadlines in them were unenforceable.[8]  Halay was also present at the hearing where a district court granted an injunction forbidding Jeffrey or anyone acting in concert with him from filing a financing statement—and heard the judge say that any such filings were illegitimate and unlawful.  The State also presented evidence that, even before she reviewed the letter or attended the court date, Halay knew that her efforts to "refuse to contract" with the State had not halted the criminal proceedings for her, or her son's, traffic violations.  She and her son were both arrested after failing to appear for their court dates, and Halay testified that their refusals to participate in the proceedings "really blew up in [their] face[s]."  From this evidence, the jury could have reasonably concluded that Halay knew that the premise under which she was acting—that she could opt out of the laws of the State of Texas—was incorrect, but that she simply refused to recognize the State's authority to enforce its laws.

Further, Halay testified that she spent weeks studying the Uniform Commercial Code and the law of secured transactions.  *See* Tex. Bus. & Com. Code Ann. §§ 9.101-.709 (West 2002 & Supp. 2008).  After hearing this testimony, the jury could have reasonably determined that Halay was aware of the applicable law.  The jury also heard testimony from Halay and from the public officials against whom she filed that her only contact with the victims was through the legal system; she had no private business dealings with them.  Other than the responses by the Garden Ridge and Schertz city attorneys, Halay did not receive any correspondence from the people against whom she

---

[8]  Halay testified, "What [Hyde] did was write letters that we are—'We don't owe you any money, we're not going to answer any more of your questions.'"

filed the financing statements, which the jury could have taken as conclusive evidence that Halay did not have a valid security interest. *See id.* § 9.203(b)(3)(A) (West Supp. 2008). From this, the jury could have reasonably concluded that Halay was aware that the debtors she named had not entered into any agreements to pay her money, and that therefore the financing statements she filed were materially false.

Halay also argues that because she did not intend to collect on the claimed debts and because the State did not show that the victims suffered actual financial harm, the State did not prove that she acted with the requisite intent to harm. *See* Tex. Penal Code Ann. § 37.107(b) (intent to harm upgrades offense of filing false or groundless financing statement to state jail felony). We first note that, according to the plain language of the statute, the State is only required to prove that Halay intended to harm the individuals against whom she filed the financing statements, not that she succeeded in actually harming them. Harm includes "anything reasonably regarded as loss, disadvantage, or injury." *Id.* § 1.07(a)(25) (West Supp. 2008). There is no requirement that the harm be physical. *See Hudspeth v. State*, 31 S.W.3d 409, 411 (Tex. App.—Amarillo 2000, pet. ref'd). Pecuniary harm, and even emotional harm and aggravation, can reasonably be considered loss, disadvantage, or injury. *See, e.g.*, *Margraves v. State*, 34 S.W.3d 912, 923 (Tex. Crim. App. 2000) (Johnson, J., concurring) (defrauding is subset of harm); *Pierce v. State*, 113 S.W.3d 431, 436 (Tex. App.—Texarkana 2003, pet. ref'd) (pecuniary loss is harm); *Fisher v. State*, 803 S.W.2d 828, 830-31 (Tex. App.—Dallas 1991, pet. ref'd) (harm exists where defendant made complainant "potentially liable for monetary damages"); *White v. State*, No. 14-05-00454-CR, 2006 Tex. App. LEXIS 8396, at *6-7 (Tex. App.—Houston [14th Dist.] Sept. 28, 2006, pet. ref'd.) (mem. op.) (harm includes emotional harm and aggravation).

13

The director of the Secretary of State's Uniform Commercial Code division, Randy Moes, testified regarding the impact of filed financing statements. When someone seeks to borrow money from a bank or other lending institution, that lender will typically search the Secretary of State's database to review the applicant's other debts, if any. Once a financing statement is filed with the Secretary of State's office, whether fraudulent or not, it shows up in that search, and can cause the lender to deny the loan application. According to Moes, "it becomes the debtor's responsibility or the debtor's burden to try and prove" the statement is fraudulent, which can only be conclusively established by the costly and time-consuming process of obtaining a judicial finding of fact. In addition, Judge Richard testified that he found the financing statements to be "very threatening, because . . . the people that look at these things don't know whether it's a legally binding document or not . . . . [O]n the face of it, it's been filed with the Secretary of State and it could have devastating effects." Accordingly, we hold that the financing statements filed in this case, which encumbered the property of the individual victims, fall within the statutory definition of harm.

Like knowledge, intent can be inferred from the "acts, words, and conduct of the accused." *See Hart*, 89 S.W.3d at 64. The sheer size and scope of the claimed debts—ranging in amount from $5,000 to $16,500,000 and attaching all of the subject's property and assets—suggests an intent to harm. In addition, the jury could have interpreted Halay's testimony that her motivation for filing the financing statements was her belief that she and her family were being harassed by the police as evidence that she sought to harm the subjects of the financing statements in retaliation for that harassment. Halay herself testified that she thought filing the financing statements was "finally the teeth that would get them to stop." The jury also heard evidence that Halay maintained a weblog

14

wherein she wrote, "It is time to go after the judges," and urged people to "lock and load" against judges.

In light of the evidence presented at trial, we hold that a reasonable jury could have determined that the State proved beyond a reasonable doubt that Halay acted knowingly and with intent to harm when she filed the thirteen fraudulent financing statements at issue. Thus, the evidence is legally sufficient, and we overrule Halay's second point of error. We further hold that the evidence is not so weak as to render the guilty verdicts on counts one through thirteen manifestly unjust or against the great weight and preponderance of the evidence. Therefore, the evidence is factually sufficient, and we overrule Halay's third point of error.

Halay next argues, in her fourth and fifth points of error, that the evidence is legally and factually insufficient to sustain the verdicts of guilty for retaliation. Halay contends that the State failed to prove that Deputy Faulkner or Constable Jahns were harmed by the filings or that the filings were "in retaliation" for their service or status as public servants.

To prove the offense of retaliation, the State must first prove that Halay "harm[ed] or threaten[ed] to harm" Faulkner and Jahns. *See* Tex. Penal Code. Ann. § 36.06. As previously discussed, harm is defined as "anything reasonably regarded as loss, disadvantage, or injury," *id.* § 1.07(a)(25), and financing statements such as those filed by Halay could potentially affect the victims' ability to obtain a loan and subject them to the costly and time-consuming process of removing the financing statement from the Secretary of State's database. Thus, we hold that the undisputed evidence that Halay encumbered all of Faulkner's and Jahns's assets, land, and personal property—by filing financing statements claiming debts of $5,000 and $20,000 respectively—is sufficient evidence of harm.

15

The State must also prove that the financing statements were filed in retribution for Faulkner's and Jahns's service as public servants. *Helleson v. State*, 5 S.W.3d 393, 396 (Tex. App.—Fort Worth 1999, no pet.). An accused's retaliatory motivation may be proved by circumstantial evidence. *Id.* Halay argues that she did not file the financing statements against Faulkner and Jahns on account of their public service, but rather to remedy a wrongful trespass on her property by the two officers. As peace officers, Faulkner and Jahns are required to "execute all lawful process issued to [them] by any magistrate or court." Tex. Code Crim. Proc. Ann. art. 2.13(b)(2) (West 2005) (establishing duties of peace officers); *see also id.* art. 2.12 (West 2005) (defining peace officer to include deputy sheriffs and constables). The jury heard testimony that Faulkner and Jahns were each carrying out that duty when they entered Halay's property. Thus, the jury could have reasonably determined that Halay's motivation of remedying "wrongful trespass" was not mutually exclusive from the motivation of retaliation against the officers for fulfilling their duty as public servants. The jury could have further concluded that the two motivations were, in fact, one and the same.

We hold that a reasonable jury could have determined that the State proved beyond a reasonable doubt that Halay harmed Faulkner and Jahns when she filed the financing statements at issue and that she did so in retaliation for their service as public servants. Thus, the evidence is legally sufficient to sustain the verdicts, and we overrule Halay's fourth point of error. The evidence is also not so weak as to render the guilty verdicts on counts fourteen and fifteen manifestly unjust or against the great weight and preponderance of the evidence; the evidence is factually sufficient, and we therefore overrule Halay's fifth point of error.

*The Jury Charge*

In her sixth and seventh points of error, Halay contends that the jury charge allowed the jury to reach a non-unanimous verdict. In reviewing a jury charge, we must first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error is found, the standard for reversal depends on whether a timely objection was made in the trial court. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). If the error was the subject of a timely objection, reversal is required upon a showing of "some harm." *Id.* If no proper objection was made at trial, reversal is only proper in the presence of egregious harm. *Id.* Because Halay failed to object to the charge at trial, we will only reverse if we find both that error exists and that this error caused Halay to suffer egregious harm. *Id.*

Halay argues that the admonition in the charge for each of the fifteen counts that the jury needed to find that Halay filed a financing statement that she "knew was forged and/or contained a material false statement and/or was groundless" was error because it allowed the jury to convict if some jurors found only that she knew the statement was forged, while others found only that she knew the statement contained a material false statement or that she knew the statement was groundless. This, Halay contends, violates the requirement that all criminal convictions be by unanimous verdict. *See* Tex. Const. art. V, § 13; Tex. Code Crim. Proc. Ann. art. 36.29(a) (West Supp. 2008). However, this argument does not take into account the rest of the sentence, which explains exactly what the jury must find: "to wit: by falsely naming [subject of the financing statement] as a debtor and Renee Louise Halay a/k/a Renee Robinson Halay as a secured party." This statement, combined with the specific instruction in the charge stating, "Your verdict must be

17

by a unanimous vote of all members of the jury," is enough to ensure that the jury's verdict was based on a unanimous finding that Halay filed a financing statement that contained at least two materially false statements—that the subject of the filing was a debtor and that Halay was a secured party.

Furthermore, the requirement that a jury render a unanimous verdict only requires the jury to agree on the same offense. *Jefferson v. State*, 189 S.W.3d 305, 311 (Tex. Crim. App. 2006). It does not require the jury to agree on the method of committing that offense. *Id.* Halay contends that section 37.101 describes three separate offenses—filing a forged statement, filing a materially false statement, and filing a groundless statement—and thus maintains that the jury had to be unanimous in its conclusion as to which type of statement Halay filed. *See* Tex. Penal Code Ann. § 37.101. The State, on the other hand, argues that section 37.101 defines just one offense—filing a fraudulent financing statement—and that forgery, a materially false statement, and groundlessness are each different methods of making the statement fraudulent. *See id.* We agree with the State. The essential inquiry is what constitutes the "gravamen of an offense." *Pizzo v. State*, 235 S.W.3d 711, 714 (Tex. Crim. App. 2007). The offense is not complete until a fraudulent financing statement is presented for filing, *see* Tex. Penal Code Ann. § 37.101(a), and we hold that this is the essential element of the offense. *Cf. Jefferson*, 189 S.W.3d at 312 ("[T]he essential element or focus of the statute is the result of the defendant's conduct . . . and not the possible combinations of conduct that cause the result."). This interpretation is supported by the legislative history, which makes clear that the purpose of the statute is to prevent the filing of fraudulent documents and the harm that results from that filing. *See* House Comm. on Criminal Jurisprudence, Bill Analysis, Tex. H.B. 1185,

18

75th Leg., R.S. (1997); Sen. Jurisprudence Comm., Bill Analysis, Tex. H.B. 1185, 75th Leg., R.S. (1997).

Thus, we overrule Halay's sixth and seventh points of error.

*Ineffective Assistance of Counsel*

In her first, eighth, ninth, tenth, and eleventh points of error, Halay argues that she was prejudiced by ineffective assistance of counsel. Specifically, Halay contends that her counsel was ineffective for failing to move for a directed verdict and for failing to strike a juror for alleged prejudice.

In reviewing a claim of ineffective assistance of counsel, we first ask whether an attorney's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hernandez v. State*, 988 S.W.2d 770, 774 (Tex. Crim. App. 1999). An attorney's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687; *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). If the performance was deficient, we ask whether that deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687; *Thompson*, 9 S.W.3d at 812. An attorney's deficient performance is prejudicial when, but for the attorney's unprofessional conduct, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

Halay maintains that her counsel's performance was deficient because he failed to move for a directed verdict at the close of the State's case or at the close of the evidence. Halay argues that she was prejudiced by this failure because there is a reasonable probability that the judge would have granted the motion and thus the results of the proceedings would have been different.

19

*See id.* at 693-94. In determining whether an attorney's performance is deficient, we apply a strong presumption that the attorney's conduct was within the range of reasonable professional assistance. *Thompson,* 9 S.W.3d at 812. "The fact that the defense attorney may or could have moved for a directed verdict on the possibility of its being granted does not show that trial counsel's assistance was ineffective." *McGarity v. State*, 5 S.W.3d 223, 229 (Tex. App.—San Antonio 1999, no pet.).

Halay contends, however, that a directed verdict definitely would have been granted, making her attorney's failure to request one both deficient and prejudicial. This contention is based on her argument that the evidence was factually and legally insufficient. As we noted above, however, the evidence was neither legally nor factually insufficient; the State did in fact prove every element of the offenses. Since the evidence sufficiently proved that Halay knowingly filed a financing statement she knew to contain a material false statement with intent to harm the individuals involved, and that she did so against Deputy Faulkner and Constable Jahns in retaliation for their service as public servants, Halay failed to prove by a preponderance of the evidence that defense counsel's failure to move for a directed verdict was deficient or would have provided a different outcome at trial. *See McGarity*, 5 S.W.3d at 229. Thus, we overrule Halay's first issue on appeal.

Halay also argues that trial counsel was ineffective for failing to strike an allegedly biased juror.[9] In Halay's motion for a new trial, her trial counsel avers that "although [Halay] and

---

[9] Because Halay did not attempt to strike the juror for cause or exhaust all of her peremptory challenges, she cannot attack the juror's presence directly, *see Payton v. State*, 572 S.W.2d 677, 679 (Tex. Crim. App. 1978), and instead attacks her trial counsel's failure to strike the juror as ineffective assistance of counsel.

undersigned trial counsel agreed that Michael J. Sorbera should be struck, and while trial counsel intended to strike Mr. Sorbera, he failed to do so . . . . This omission was unintentional and not a matter of strategy in defense." Assuming arguendo that forgetting to strike a juror one intended to strike is ineffective assistance of counsel per se, we turn to the question of whether the juror's presence prejudiced Halay.[10]

Halay maintains that juror Sorbera was biased against her and towards one of the victims, and that his bias prevented her from receiving a fair trial before an impartial jury. We disagree. A juror is biased when "an inclination toward one side of an issue rather than to the other leads to the natural inference that [the juror] will not or did not act with impartiality." *Anderson v. State*, 633 S.W.2d 851, 853 (Tex. Crim. App. 1982). In determining whether a juror is prejudiced, we look to the totality of the prospective juror's responses concerning his qualifications to serve. *See Porter v. State*, 623 S.W.2d 374, 377 (Tex. Crim. App. 1981).

Halay's claim that Sorbera was biased against her is based on Sorbera's statement that a defendant's decision to have the judge, rather than the jury, decide sentencing would, for him, raise a presumption that the defendant was guilty. Sorbera's theory was that choosing judge sentencing shows the defendant "wants the judges to do a lenient sentence because judges [issue more lenient

---

[10] We note, however, that there is nothing in the record to support trial counsel's contention that he intended to strike Mr. Sorbera. He did not express any concerns about Mr. Sorbera to the trial court, nor did he move to strike Mr. Sorbera for cause. This court is reluctant to entertain trial counsel's claim, made only post-trial and with the benefit of hindsight, that he "intended" to strike a juror, absent any evidence of such intent in the record. Furthermore, even if failing to strike a juror was a mistake, it was not necessarily one that was "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

sentences] than juries in this type of case." Later questioning revealed that by "this type of case," Sorbera was referring to a sexual assault case. After he was told by the court and the prosecutor that it was not a sexual assault case, Sorbera repeatedly indicated that he could be an impartial juror for the guilt-innocence phase even if the judge were to handle sentencing. He told the prosecutor that he would have "no problem" sitting on the jury. Later, when defense counsel asked Sorbera about his expressed concern about not determining punishment, Sorbera responded, "Well, I kind of negated that once we figured out that this wasn't a sexual assault case . . . . That was when we were under the impression that it was something else." Sorbera maintained this position even as other jurors stated that they could not be impartial if not judging sentencing, no matter the type of case. Given Sorbera's rehabilitation, Halay has not shown that Sorbera was biased against her.

Halay also maintains that Sorbera was biased toward one of the victims, Sheriff Bob Holder. This bias is supposedly revealed in Sorbera's statement that he knew Sheriff Holder "through Republican connections, just met him." When asked if he could render an impartial verdict, however, Sorbera responded, "Sure. No problem." Halay also contends that Sorbera is impliedly biased because of his position as a city councilman and his former position as mayor pro tem of Bulverde, another city in Comal County. Sorbera told defense counsel that his service on the city council would not impact his ability to be impartial. A juror can be so closely connected to a victim or witness as to be biased as a matter of law. *See Anderson*, 633 S.W.2d at 854. When a juror is biased as a matter of law, "he must be excused when challenged, even if he states that he can set aside his bias and provide a fair trial." *Id.* A "tangential acquaintance with the victim," however, is not enough to establish bias as a matter of law. *Id.* at 853. Sorbera told the trial court that he

22

could be a fair and impartial juror; his affiliations with the city of Bulverde and with one of the victims do not prove bias in the face of his assertions to the contrary.

Because Halay has not shown that Sorbera was biased, she has not proven that she was prejudiced by her trial counsel's failure to strike him from the jury. Therefore, we overrule points of error eight through eleven.

*Double Jeopardy*

In her twelfth and final point of error, Halay argues that her prosecution for count nine was barred because she had previously been held in contempt for filing against Judge Padgett in violation of a temporary restraining order.[11] Where there are no underlying questions of fact, double jeopardy is a question of law we review de novo. *See Vasquez v. State*, 22 S.W.3d 28, 31-32 (Tex. App.—Amarillo 2000, no pet.).

The double jeopardy clauses of the federal and state constitutions protect citizens against multiple prosecutions or multiple punishments for the same offense. *See* U.S. Const. amend. V; Tex. Const. art. I, § 14; *United States v. Dixon*, 509 U.S. 688, 695-96 (1993); *Ex parte Cavazos*, 203 S.W.3d 333, 336 (Tex. Crim. App. 2006). A contempt order that is punitive, rather than

---

[11] Halay also claims that double jeopardy would bar her prosecution for counts ten and eleven. However, the temporary restraining order barred her from filing against Judge Padgett and a court employee, Esther Mendoza. The TRO did not reference Michael Spain or Benjamin Cooke, the subjects of the filings in counts ten and eleven. Filing against people not mentioned in the TRO could not have been the source of a contempt conviction. Since Halay has not previously been punished for those filings, double jeopardy does not bar Halay's prosecution for those crimes.

coercive, in nature is considered punishment for purposes of the double jeopardy clause.[12] *Ex parte Hudson*, 917 S.W.2d 24, 26 (Tex. 1996); *Ex parte Jones*, 36 S.W.3d 139, 142 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). A majority of the justices on the United States Supreme Court applied the double jeopardy analysis to punitive civil contempt convictions initiated by a private party in *Dixon*, 509 U.S. at 693-96 (Scalia, J., plurality opinion), 697-703 (Rehnquist, J., concurring and dissenting), 731-37 (White, J., concurring and dissenting), 763 (Souter, J., concurring and dissenting). Because there was no majority opinion in *Dixon*, the Texas Court of Criminal Appeals has instructed appellate courts to apply the legal reasoning adopted by each of the individual justices in *Dixon* to determine whether a majority of the justices would find that a conviction is barred by double jeopardy. *Ex parte Rhodes*, 974 S.W.2d 735, 739-40 (Tex. Crim. App. 1998). Therefore, we must apply the legal analyses used by the various justices to the facts of this case to determine whether Halay's prosecution is barred. *See id.* at 740.

In *Dixon*, Justice Scalia, joined by Justice Kennedy, *see* 509 U.S. at 697-703, applied the same-elements test of *Blockburger v. United States*, 284 U.S. 299, 304 (1977), focusing on whether the contempt conviction and the fraudulent filing conviction each required proof of a fact which the other did not. The elements that must be proved in a "constructive criminal contempt

---

[12] A contempt order that is coercive in nature—designed to prevent future violations of an injunction or court order or to convince the violator to remedy the violation—is not considered punishment for purposes of double jeopardy. *Ex parte Hudson*, 917 S.W.2d 24, 26 (Tex. 1996); *Ex parte Jones*, 36 S.W.3d 139, 142 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). The only information we have about the civil contempt order at issue here is from opposing attorney Benjamin Cooke, who testified, "I think [the court] imposed a fine and a period of probation." Without more, we cannot determine if any portion of the contempt order was punitive in nature. We will assume arguendo that it was punitive and that the double jeopardy clause applies.

conviction"—a conviction arising from a civil proceeding—are: (1) a reasonably specific order; (2) a violation of the order; and (3) knowledge that the underlying action was a violation of the order. *Rhodes*, 974 S.W.2d at 740-41. Thus, the elements of Halay's contempt conviction were that she filed a financing statement encumbering Judge Padgett's property with the Secretary of State knowing that doing so was a violation of the TRO.[13] The contempt conviction requires proof that Halay knew of the TRO and that her actions were a violation of it—the fraudulent filing conviction does not. Similarly, the fraudulent filing conviction requires proof that Halay knew the filings contained a materially false statement and proof of intent to harm—the contempt conviction does not. Because the contempt conviction and the fraudulent filing conviction each require proof of a fact that the other does not, Halay's conviction for count nine is not barred by double jeopardy under Justice Scalia's analysis.

Former Chief Justice Rehnquist, joined by Justices O'Connor and Thomas, also applied *Blockburger*, but argued that the analysis should focus "not on the terms of the particular court orders involved, but on the elements of contempt of court in the ordinary sense . . . . Because the generic crime of contempt of court has different elements than the substantive criminal charges in this case, I believe that under *Blockburger*, they are separate offenses." *Dixon*, 509 U.S. at 714

---

[13] The TRO enjoined Jeffrey and those acting in concert with him from:

> Intentionally or knowingly filing any document that seeks or aims to encumber any personal or real property of either of the Petitioners, including any document filed with the Texas Secretary of State or a county clerk responsible for the recording of Uniform Commercial Code or land lien records in the State of Texas, including, but not limited to, Bexar County, Comal County, and Guadalupe County.

(Rehnquist, C.J., concurring and dissenting). Therefore, under Chief Justice Rehnquist's approach, Halay's conviction for count nine is not barred by double jeopardy.

In light of the fact that five justices joined in the first two opinions, we need not address how Halay would fare under the approaches used by the remaining justices in *Dixon*. Because Halay's conviction is not barred under the analyses adopted by a majority of the justices, we hold that double jeopardy is not implicated in the present case. *See Rhodes*, 974 S.W.2d at 740. Halay's twelfth point of error is overruled.

However, there is a double jeopardy violation apparent on the face of the record for counts one and eight, which are the counts related to the financing statements filed against Deputy Faulkner and Constable Jahns. *See Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000) (double jeopardy may be raised for first time on appeal "when the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record and when enforcement of usual rules of procedural default serves no legitimate state interests"); *Wright v. State*, 981 S.W.2d 197, 199 n.2 (Tex. Crim. App. 1998) (appellate court may consider unassigned error). These are the same filings for which Halay was convicted of retaliation in counts nineteen and twenty. When the same conduct violates more than one penal statute, we apply the *Blockburger* same-elements test to determine whether conviction under both statutes constitutes multiple punishments for the same offense. 284 U.S. at 304. If one of the offenses is a lesser-included offense of the other, the two offenses are presumed to be a single offense and the person can only be prosecuted once for that offense. *Langs v. State*, 183 S.W.3d 680, 685 (Tex. Crim. App. 2006). To determine if the offense of fraudulently filing a financing statement is included in the greater offense of retaliation, we compare

26

the statutory elements as they were alleged in the indictment. *Hall v. State*, 225 S.W.3d 524, 535-36 (Tex. Crim. App. 2007).

In counts nineteen and twenty, the State had to prove that Halay unlawfully filed a financing statement against Faulkner and Jahns, as alleged in counts one and eight, respectively. Because all of the elements of the fraudulent filing offense were included within the retaliation offense, the two offenses were the same for double jeopardy purposes, and Halay's conviction for both constitutes double jeopardy. When a defendant is convicted for two offenses that are the same for double jeopardy purposes, the conviction for the most serious offense is retained and the other conviction is set aside. *See Ex parte Cavazos*, 203 S.W.3d at 338. Because retaliation is the more serious offense, we will set aside the fraud conviction. *Id.* (holding that "the 'most serious' offense is the offense of conviction for which the greatest sentence was assessed").

## CONCLUSION

Because the double jeopardy clause bars Halay's conviction for counts one and eight, those convictions are reversed and prosecution of those counts is dismissed. We overrule all points of error and affirm the judgments of conviction for the remaining counts.

_____

Diane M. Henson

Before Justices Patterson, Waldrop and Henson

Affirmed in Part; Reversed and Dismissed in Part

Filed:   December 31, 2008

Do Not Publish